UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EARLE STEINBERG,　　　　　　　　　　　Case No. 09-11836

　　　　　Plaintiff,　　　　　　　　　　　HONORABLE SEAN F. COX
　　　　　　　　　　　　　　　　　　　　United States District Judge
v.

CHARLES YOUNG, et al.,

　　　　　Defendants.
_____/

## OPINION & ORDER GRANTING IN PART DEFENDANT VENDOR MANAGED SOLLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 71]

Plaintiff Earle Steinberg ("Steinberg") filed this breach of contract and fraudulent transfer action against Defendants Charles Young, Jr. ("Young") and numerous business entities owned in whole or in part by Young, in the Oakland County, Michigan, Circuit Court on April 7, 2009. Defendant JPMorgan Chase Bank, N.A. ("Chase") was allowed to intervene in the state court proceedings on April 29, 2009, and on May 13, 2009 Chase removed this action. [Doc. No. 1]. The matter is currently before the Court on Defendant SDE Vendor Managed Solutions, Inc., n/k/a Vendor Managed Solutions, Inc.'s ("VMS") motion for summary judgment [Doc. No. 71]. The parties have fully briefed the issues, and a hearing was held on February 25, 2010. For the reasons below, the Court **GRANTS** VMS's motion [Doc. No. 71] with respect to Count I of Mr. Steinberg's Complaint, and **DISMISSES** Mr. Steinberg's fraudulent conveyance action [Count I] against VMS. As genuine issues of material fact remain regarding Mr. Steinberg's successor liability claim against VMS, however, the Court **DENIES** VMS's motion [Doc. No. 71] with respect to Count III of Mr. Steinberg's Complaint.

1

BACKGROUND

Mr. Young is the owner or majority shareholder of several corporate entities ("the SDE Entities") that provide purchasing services to large companies in an effort to make purchasing more efficient.

On or about September 21, 2006, Mr. Steinberg entered into an employment contract with two of the SDE Entities, SDE MRO INC and SDE BP, with Mr. Young signing the employment contract on behalf of the SDE Entities. Mr. Steinberg began working for SDE MRO INC in 2007 pursuant to the written employment contract, receiving an initial retention bonus of $700,000 and an annual base salary of $750,000 per year.

Mr. Steinberg never received $500,000 of his $700,000 retention bonus. Mr. Young is also alleged to have twice acted unilaterally in reducing Steinberg's base salary: from $750,000 to $502,000 on September 28, 2007; and from $502,000 to $250,000 on January 7, 2008. When Mr. Steinberg objected to these reductions in his compensation, Mr. Young demanded that Mr. Steinberg accept a new employment contract or resign. Mr. Young ultimately terminated Mr. Steinberg's employment on February 4, 2008.

On February 8, 2008, Mr. Steinberg filed an arbitration claim against Mr. Young, SDE BP and SDE MRO INC with the American Arbitration Association ("AAA") for breach of the employment contract. On January 21, 2009, the AAA panel found Mr. Young's defense to be frivolous, and granted Mr. Steinberg a monetary award in the amount of $1,049,587.45, plus interest. Mr. Steinberg filed a Motion to Confirm Arbitration Award in the Oakland County, Michigan, Circuit Court on February 11, 2009, which was confirmed and entered as a judgment on February 18, 2009 in the amount of $1,052,777.53.

While Mr. Steinberg was pursuing the arbitration action against Mr. Young and the SDE Entities, Mr. Steinberg alleges that Mr. Young transferred funds, real property, and business opportunities between and among the SDE Entities in an effort to hinder Mr. Steinberg's collection efforts and to conceal or dissipate assets. During subsequent creditor's examinations, Mr. Young admitted that money had been shifted between companies whenever one entity needed funds, which Mr. Young himself characterized as "robbing Peter to pay Paul." [Doc. No. 11, Ex. 5, p.81].

Mr. Young also allegedly purchased several homes in the Flint, Michigan area with assets from the SDE Entities, and quitclaimed those properties between and among limited liability companies he controlled, in an effort to further conceal assets.

Finally - and directly pertinent to this motion - Mr. Young is accused of transferring his interests in several of the SDE Entities to third parties for less than full value, further evidence that Mr. Young may be attempting to hide assets from creditors. Mr. Young is also alleged to have transferred several lucrative contracts between the SDE Entities for negligible consideration. Relevant to this motion, Mr. Steinberg alleges that another corporation, VMS, was created as the "mere continuation" of SDE BP. SDE BP then transferred its interest in a procurement account for ExxonMobil ("the ExxonMobil Account") to VMS for what Mr. Steinberg alleges was negligible consideration.

After receiving his $1,052,777.53 judgment against Mr. Young and SDE MRO INC in Michigan state court, Mr. Steinberg filed the instant action in the Oakland County, Michigan, Circuit Court on April 7, 2009. In this action, Mr. Steinberg alleges that Mr. Young has abused the corporate form of the SDE Entities, and that Mr. Young has been fraudulently transferring

3

assets out of the SDE Entities in an effort to defeat Mr. Steinberg's collection efforts. The Bank intervened in this action on May 13, 2009, and removed this action to federal court.

Mr. Steinberg's Complaint [Doc. No. 1] alleges two causes of action against VMS: 1) an action to avoid fraudulent transfers under Michigan's Uniform Fraudulent Transfer Act, M.C.L. § 566.31 *et seq.* [Count I]; and 2) an action for successor liability against VMS as the "mere continuation" of SDE BP [Count III].[1]  On November 4, 2009, VMS filed its motion for summary judgment [Doc. No. 71], arguing that both causes of action filed by Mr. Steinberg against VMS should be dismissed. Mr. Steinberg opposes the motion, and filed a brief in opposition on December 7, 2009 [Doc. No. 76]. After the February 25, 2010 hearing, the Court allowed the parties to each file supplemental briefing. [*See* Doc. Nos. 90, 92].

## STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty*

---

[1] The Complaint also alleges other causes of action against defendants not relevant to the instant motion for summary judgment by VMS.

*Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

VMS argues that both of Mr. Steinberg's causes of action against VMS - for fraudulent conveyance avoidance and for successor liability - should be dismissed. For the reasons that follow, the Court **GRANTS IN PART** VMS's motion with respect to Count I of Mr. Steinberg's Complaint, and **DISMISSES** Mr. Steinberg's fraudulent conveyance action [Count I] against VMS. As genuine issues of material fact remain regarding Mr. Steinberg's successor liability claim against VMS, however, the Court **DENIES** VMS's motion with respect to Count III of Mr. Steinberg's Complaint.

I. Steinberg's "Fraudulent Conveyance" Claim Against VMS.

In Count I of his Complaint, Steinberg alleges that the transfer of the ExxonMobil Account from SDE-BP to VMS was fraudulent due to the fact that SDE-BP did not receive "reasonably equivalent value" in the exchange.

In its motion, VMS makes three independent arguments why it should be granted summary judgment on this claim: 1) because the ExxonMobil Account was not an "asset" of SDE-BP; 2) even if the ExxonMobil Account was an "asset" of SDE-BP, it remains encumbered by a valid security interest; and 3) reasonably equivalent value" was given by VMS in the transfer of the ExxonMobil Account from SDE-BP. The Court finds for VMS on the third of these arguments.

Steinberg has alleged that SDE-BP's transfer of the ExxonMobil Account to VMS was in violation of Michigan's Uniform Fraudulent Conveyance Act, M.C.L. § 566.31 *et seq*. That statute states, in pertinent part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under either of the following:
> > (a) With actual intent to hinder, delay, or defraud any creditor or the debtor.[2]
> > (b) *Without receiving a reasonably equivalent value in exchange for the transfer or obligation,* and the debtor did any of the following:
> > > (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
> > > (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

M.C.L. § 566.34(1) (emphasis added). Thus, under M.C.L. § 566.34(1)(b), the transfer between SDE-BP and VMS of the ExxonMobil Account was only fraudulent if SDE-BP did not receive "reasonably equivalent value" for the assignment of its interest in that account. In the instant case, however, VMS *did* pay "reasonably equivalent value" for the ExxonMobil Account.[3]

---

[2]Though Steinberg's Complaint also alleges that other entities engaged in transfers of SDE-BP assets "with actual intent to hinder, delay or defraud. . .," no such allegation was made against VMS in the Complaint, and Steinberg makes no argument under § 566.31 in either of his briefs filed related to the instant motion. [*See* Doc. Nos. 76, 90].

[3] This holding renders VMS's two other arguments - i.e., that the ExxonMobil Account was not an "asset" of SDE-BP and that the ExxonMobil Account remained encumbered by a valid lien - moot.

For the record, however, the ExxonMobil account was unquestionably an "asset" of SDE-BP. Contractual rights, such as the right here for SDE-BP to serve as a preferred vendor under the ExxonMobil procurement contract, are routinely upheld as property rights - and therefore "assets" of the debtor - under Michigan law. *See, e.g.*, *Fodale v. Waste Mgmt. of Mich.*, 271 Mich. App. 11 (2006) (option constitutes intangible personal property); *Jewel Const. Co. Inc. v. Genoak Const. Co.*, 2006 WL 2924528 (Mich. App. Oct. 12, 2006) (personal property rights include contract rights).

Further, while M.C.L. 566.31(b)(i) exempts property "encumbered by a valid lien" from assets subject to MUFTA, VMS has proffered no evidence that the ExxonMobil Account remains encumbered by the Chase security interest - indeed, the asset purchase agreement between VMS and SDE-BP for the ExxonMobil Account specifically warranted that the transfer was "free and clear of all liens, pledges, mortgages, security interests, claims of interests, and encumbrances of any nature whatsoever." [Pl.'s Ex. 3, Doc. No. 76, § 1.1].

Though the Michigan Uniform Fraudulent Transfer Act does not define "reasonably equivalent value," Michigan Courts have imported the analysis used in the Federal Bankruptcy Code, which assists Bankruptcy Courts in evaluating similar issues. *See Willecke v. Toth*, 2009 WL 3153081, *4 (E.D. Mich. Sept. 30, 2009) (Cook, J.).

Determination of "reasonably equivalent value" under § 548(a)(1)(B) of the Bankruptcy Code is a two step process. "The court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up." *Grochocisnky v. Reliant Interactive Media Corp.*, 322 B.R. 836, 844 (N.D. Ill. 2005) (internal citation omitted). "The second inquiry, whether what the debtor gave up was reasonably equivalent to what he received, is more difficult. Equivalent value must be measured at the time of the transfer." *Id.* (internal citations omitted).

In the instant case, SDE-BP unquestionably received *value* from VMS in selling the ExxonMobil Account - VMS agreed to remit to SDE-BP 2% of all gross receivables generated by the ExxonMobil Account for a two-year period, an amount which Steinberg concedes is 40% of the profit margin generated by the ExxonMobil Account. [*See* Pl.'s Br., Doc. No. 76, p.13]. Thus, the only issue remaining is whether the 2% gross payment promised to SDE-BP "is reasonably equivalent to what the debtor gave up." *Id.* As the party challenging whether "reasonably equivalent value" was given, Steinberg bears the burden of proof on this issue. *Id.*

"[I]t is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *In re Congrove*, 330 B.R. 880, 2005 WL 2089856, *3 (6th Cir. B.A.P. Aug. 31, 2005). Steinberg, however, argues that only transferring an amount equivalent to 40% of the ExxonMobil Account's markup falls short of "reasonably equivalent value":

> If the ExxonMobil Account had not been transferred, SDE BP would have
> received 100% of this sum. However, because of the transfer, SDE BP
> purportedly received only 40%. . . . Receiving 40% of the markup is not
> equivalent to receiving 100%. Further, there should not even be a question of fact
> that 40% is not even *reasonably* equivalent to 100%.

[Pl.'s Br., Doc. No. 76, p.13 (internal citations omitted) (emphasis in original)].

This argument lacks merit for two reasons. First, it is undisputed that SDE-BP was in dire economic straits at the time it sold the ExxonMobil Account to VMS. Indeed, this argument is central to Steinberg's entire cause of action - that, on the eve of insolvency, Mr. Young sought to transfer assets to other entities in an attempt to avoid creditor claims. It is also undisputed that *SDE-BP ceased operations in December of 2008*, and thus would have been incapable of generating *any* sales on the ExxonMobil Account after that time. As argued by VMS in its brief:

> The reality is that SDE BP gave up nothing. . . while preserving 2% of the gross
> revenues. Stated otherwise, SDE BP eliminated all capital and labor
> expenditures, yet preserved 40% of the revenue stream [generated by the
> ExxonMobil Account], all of which now goes to reduce its debt to Chase [as
> SDE-BP's secured creditor].

[Def.'s Br., Doc. No. 71, p.8].

Second, reducing the gross revenue stream generated by the ExxonMobil Account by 60% does not necessarily mean that SDE-BP also reduced its *net profits* generated from that account. Like any business, SDE-BP's ability to generate a revenue stream from the ExxonMobil Account does not come without costs. If SDE-BP *could* have managed to stay afloat as a going concern, and therefore continued to service the ExxonMobil Account, overhead costs likely would have significantly cut into the 100% gross receivables figure Steinberg claims would otherwise be available to SDE-BP's creditors. This was confirmed by VMS at the February 25, 2010 hearing, where counsel for VMS represented that the ExxonMobil Account

generated almost no net revenue, and typical net profit margins in the procurement industry are historically only in the 1-2% range - the exact amount VMS paid to SDE-BP for the assignment of the ExxonMobil Account.

As the party with the ultimate burden of proof, it is incumbent upon Mr. Steinberg to bring forth facts sufficient for a jury to determine that "reasonably equivalent value" was not received by SDE-BP. *Grochocisnky*, 322 B.R. at 844. Here, Mr. Steinberg has brought forth no evidence that the ExxonMobil Account would have had additional value on the open market above the 2% gross revenues paid by VMS. Michigan courts routinely grant summary disposition - the state equivalent of a summary judgment motion - in instances where the plaintiff fails to bring forth any evidence related to the value of an asset on the open market. *See, e.g., Alden State Bank v. Borton*, 2005 WL 3078213, *6 (Mich. App. Nov. 17, 2005) (finding no genuine dispute regarding reasonably equivalent value where plaintiff presented no evidence that a higher price for property could have been obtained). Here, Mr. Steinberg's failure to bring forth any evidence that a higher price could have been obtained for the ExxonMobil Account is fatal to his fraudulent transfer claim against VMS.

    II.  Steinberg's "Successor Liability" Claim Against VMS.

VMS seeks summary judgment on Count III of Steinberg's Complaint, in which Steinberg alleges that VMS "is the mere continuation of SDE BP and is liable for SDE BP's debt to Plaintiff as a successor entity to SDE BP." [Pl.'s Complaint, Doc. No. 1, ¶190]. As genuine issues of material fact remain regarding this claim, the Court **DENIES** VMS's motion for summary judgment on Mr. Steinberg's successor liability claim.

The Michigan Supreme Court, in *Foster v. Cone-Blanchard Machine Co.*, 460 Mich.

9

696, 702-04 (1999) outlined the theory of successor liability under Michigan law:

> The traditional rule of successor liability examines the nature of the transaction between predecessor and successor corporations. If the acquisition is accomplished by a merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities. However, where the purchase is accomplished by an exchange of cash for assets, the successor is not liable for its predecessor's liabilities unless one of five narrow exceptions applies. The five exceptions are as follows:
>
> "(1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) *where the transferee corporation was a mere continuation or reincarnation of the old corporation*."
> \*\*\*\*\*
> [P]olicy concerns shaped this Court's expansion of the traditional rule in *Turner* [*v. Bituminous Coal Cas. Co.*, 397 Mich.406 (1976)]. After examining the relevant policy concerns, this Court in *Turner* concluded that a continuity of enterprise between a successor and its predecessor may force a successor to "accept the liability with the benefits" of such continuity. *Turner* held that a prima facie case of continuity of enterprise exists where the plaintiff establishes the following facts: (1) there is *continuation of the seller corporation*, so that there is a continuity of management, personnel, physical location, assets, and general business operations for the predecessor corporation; (2) the predecessor corporation *ceases its ordinary business operations*, liquidates, and dissolves as soon as legally and practically possible; and (3) the purchasing corporation *assumes those liabilities and obligations of the seller ordinarily necessary* for the uninterrupted continuation of normal business operations of the selling corporation. *Turner* identified as an additional principle relevant to determining successor liability, [(4)] whether the *purchasing company holds itself out to the world as the effective continuation of the seller* corporation.

*Foster*, 460 Mich. 696, 702-04 (citations and quotation marks omitted in original) (emphasis added).

On March 18, 2010 - almost a *month* after the Court held oral argument in these issues, and after the Court already allowed the parties to file supplemental briefs on this motion, VMS filed its "Motion to File Supplemental Brief" [Doc. No. 96]. In that motion, VMS argues that it

10

somehow neglected to mention in any of its prior briefs the existence of a Michigan Supreme Court holding alleged to be favorable to VMS's arguments:

> Since [the Court's February 25, 2010 hearing], Defendant VMS's counsel discovered the Michigan Supreme Court's order in *Stark[s] v. Michigan Welding Specialists, Inc.*, 477 Mich. 922 (2006). . . .

[Def.'s Proposed Supplemental Brief, Doc. No. 96, p.2]. VMS goes on to argue that, as *Starks* refused to allow a judgment creditor to take advantage of Michigan's law of successor liability, the Court should similarly preclude Mr. Steinberg from asserting a successor liability claim against VMS in this action. *Id*. at pp. 2-3. Aside from the fact that counsel for VMS is *rather late* in bringing this authority to the Court's attention, the Court finds VMS's arguments on this issue without merit.

In *Starks*, the Michigan Supreme Court issued a one-page order denying leave to appeal, instead affirming the judgment of the Court of Appeals. 722 N.W.2d at 889. In *dicta*, the Michigan Supreme Court commented as follows:

> Because an exception [i.e., successor liability] designed to protect injured victims of defective products rests upon policy reasons not applicable to a judgment creditor, the Court declines to expand the exception to the traditional rule set forth in *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), *to cases in which the plaintiff is a judgment creditor*.

*Id*. (emphasis added). An unpublished Michigan Court of Appeals case relied upon this quote from *Starks*, holding that "*Starks* makes clear that the Supreme Court will not apply the doctrine of successor liability in a purely commercial context." *Dewitt v. Sealtex Co., Inc.*, 2008 WL 231668, *4 (Mich. Ct. App. June 5, 2008).

Later in 2008, however, the Michigan Court of appeals issued its *published* opinion in *RDM Holdings, Ltd. v. Continental Plastics Co.*, 281 Mich. App. 678 (2008). *RDM Holdings*

11

made very clear that "the traditional basis for piercing the corporate veil has been to protect a corporation's creditors," *Id*. at 715, and held that there was sufficient evidence for the *creditors* of one company to bring a successor liability action against that company's alleged successor. *Id*. at 718-19. In the face of the *published* Michigan Court of Appeals opinion in *RDM Holdings*, which clearly supports a *commercial creditor's* ability to sustain a successor liability action, VMS's reliance upon a prior, *unpublished* opinion from that same court, plus *dicta* from a Michigan Supreme Court opinion, is misplaced.

In this case, Mr. Steinberg has brought forth sufficient evidence to survive summary judgment on his claim for successor liability. As Mr. Steinberg argues in his response brief:

1. SDE VMS's business is identical to SDE BP's vendor managed services group (procurement contracting and maintenance, repair and operations ("MRO" services));

2. Rumina Ambrose-Burbank was the President of SDE BP's vendor managed services group; Rumina Ambrose-Burbank is the President of SDE VMS (Exhibit 2 to SDE VMS Brief). Abrose-Burbank currently lists herself on the professional networking site, LinkedIn, as both the President of SDE BP and President/Owner of SDE VMS (Exhibit 13, Rumina Ambrose-Burbank LinkedIn profile, downloaded December 3, 2009);

3. Although formed in August 2008, SDE VMS started operations with the transfer of the vendor managed services business from SDE BP at the same time SDE BP was closing its doors;

4. SDE VMS issued a press release in February 2009 stating that it has been engaged in business for the "past ten years", even though the company was formed in August 2008, clearly trading in on the SDE BP name and previous business existence (Exhibit 22, Press Release);

5. Rumina Ambrose-Burbank signed the Assignment and Assumption Agreement with ExxonMobil purportedly as President of SDE BP and as President of SDE VMS;

6. SDE VMS used a name very similar to SDE BP and similar logos (Exhibit 12);

12

7. SDE VMS changed its name from SDE Vendor Manages Solutions to Vendor Managed Solutions on the same day its registered agent was served with this lawsuit alleging successor liability (Echibit 15, Proof of Service and Exhibit 16, Certificate of Amendment to the Articles of Incorporation);

8. In late December 2008, Rumina Ambrose-Burbank was acting for both SDE BP and SDE VMS to move the ExxonMobil Account out of SDE BP and into SDE VMS by sending e-mail correspondence to ExxonMobil from an SDE BP e-mail account (Rumina.Ambrose-Burbank@sdebp.com) and an SDE VMS e-mail account (rburbank@vmsglobal.com) and with electronic signatures on behalf of both SDE BP and SDE VMS (Exhibit 23, e-mail chain from December 2008);

9. SDE BP and SDE VMS used the same building and suite to conduct business. SDE BP used 901 Tower Drive, Ste. 400 and Ste. 450, Troy, MI 48098 and SDE VMS used 901 Tower Drive, Ste. 450, Troy, MI 48098 (Exhibit 7, Affidavit of Earle Steinberg and Exhibit 6, SDE VMS Articles of Incorporation); and

10. At least four other SDE BP employees continued with SDE VMS, Doreen Flook, Jeppie Wise, and two others not identified yet (Exhibit 13, LinkedIn profiles of Doreen Flook, Jeppie Wise, and two unidentified persons, downloaded December 3, 2009).

[Pl.'s Br., Doc. No. 76, pp.16-17]. These facts establish, under the *Turner* factors, genuine issues of material fact regarding whether VMS is the "mere continuation" of SDE BP.

On similar facts, the Michigan Court of Appeals denied a defendant's motion for summary judgment on claims for successor liability. In *RDM Holdings, Ltd. v. Continental Plastics Co.*, 281 Mich.App. 678 (2008), the court held that the plaintiff there had demonstrated genuine issues of material fact regarding whether Continental Plastics Co. was the "mere continuation" of an alleged predecessor corporation known as Con-Lighting. The Michigan Court of Appeals held as follows:

> There was documentary evidence reflecting a continuity of management, personnel, assets, and general business operations. There was also evidence that Con-Lighting ceased operations aroung the time of the changeover to Con-Coatings, or the plan to so proceed. . . . There was evidence that [customers]

13

began sourcing or procuring parts from Con-Coatings that had previously been provided by Con-Lighting. . . . A reasonable juror could surmise from the evidence that Con-Coatings was holding itself out to the world as the effective continuation of Con-Lighting. In sum, a genuine issue of material fact exists whether Con-Coatings can be held liable under a successor liability theory.

*RDM Holdings*, 281 Mich.App. at 718-20. As in *RDM Holdings*, in the instant case a reasonable juror could surmise that VMS "was holding itself out to the world as the effective continuation" of SDE BP. For these reasons, the Court **DENIES** VMS's motion for summary judgment on Mr. Steinberg's claim for successor liability [Count III].

## CONCLUSION

For the reasons explained above, the Court **GRANTS** SDE VMS's motion [Doc. No. 71] with respect to Count I of Mr. Steinberg's Complaint, and **DISMISSES** Mr. Steinberg's fraudulent conveyance action [Count I] against VMS. As genuine issues of material fact remain regarding Mr. Steinberg's successor liability claim against VMS, however, the Court **DENIES** VMS's motion [Doc. No. 71] with respect to Count III of Mr. Steinberg's Complaint.

**IT IS SO ORDERED**.

        S/Sean F. Cox
        Sean F. Cox
        United States District Judge

Dated: March 31, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2010, by electronic and/or ordinary mail.

        S/Jennifer Hernandez
        Case Manager